We'll hear argument now in the case of Starkey against the Roman Catholic Diocese of Indianapolis. Mr. Gutwein. May it please the court, I am M.R. Gutwein, representing plaintiff, Appellant Lynn Starkey. Summary judgment in this case is improper for three reasons. First, in violation of the summary judgment standard to deem Starkey a minister, the district court accepted as true defendant's evidence and relied on numerous inferences in favor of defendant, even though Starkey presented evidence that contradicts the facts and inferences on which the district court relies. Second, Section 702 of Title VII does not shield defendants from Starkey's claims of sex discrimination, even where Ron Colley was motivated to terminate her by religious doctrine. And third, defendants' alternative First Amendment claims, theories, all fail on the merits, and even if they did not, they require discovery, which the district court has not allowed. This is a summary judgment case, and that the defendants raise the ministerial exception as an affirmative defense does not change that it's a summary judgment case. In moving for summary judgment, defendants argued Starkey's job responsibilities of Ron Colley were A, B, and C, which were religious. Starkey presented evidence that her job was not A, B, and C, and confronted with that conflicting evidence, the district court resolved them in favor of defendants. Defendants are correct that most ministerial exception cases involve undisputed facts, but not this case, and the summary judgment standard applies with full force even where they are raising the ministerial exception. Before this court, defendants do not attempt to argue that when all factual disputes are resolved in Starkey's favor and all reasonable inferences are drawn in her favor, the ministerial exception nevertheless applies. Defendants ask this court to accept their version of the facts and reject Starkey's. For starters, Starkey presented evidence that the 2017 ministry contract and the 2018 ministry description did not accurately and properly describe what her job really was at Ron Colley. Mr. Gretelman, one of the arguments you make in the brief is that the nature of that agreement and the subsequent contract were pretextual. Is it the argument of the appellant here that the pretext was as a result of Starkey, or Starkey and her co-guidance counselor, or didn't these types of contracts or this type of ministry rider, didn't that apply to all teachers and all individuals who are working in archdiocesan schools? Well, that's not in the record whether it applies to all archdiocese that are working in schools. Our argument is that the only undisputed fact is that in 2018, Ron Colley provided her with that document, the ministry description, and that's undisputed. And your argument isn't that she received a unique contract or unique agreement, is it? No, no, not at all. In 2018, they gave that document to people. But at that point, she had been performing that job for 21 years, and that description did not accurately describe the job that she was performing on the day that she got that contract or the 21 years before that contract. And the test that the Supreme Court has established, and this court has, of course, followed, is what the employee does, not what is written on a piece of paper or not what lawyers write on a piece of paper. And what Starkey did, in fact, did not match that 2018 ministry description. And she presented voluminous evidence that it did not match that. Her evidence was – I did not do what my employer instructed me to do, and I won't. Why isn't that a ground for firing her? Well, that is an inference in favor of defendants. And what we know about Starkey is that she – No, I'm not asking about inferences. This is your client's own position, that she doesn't do those things, she didn't do those things, and she won't do those things. That's her stated position. It doesn't require any inferences by the judge. She had received glowing reviews for 21 years. I didn't ask about her reviews. There is no doubt that Ron Colley could have changed her job if they wanted to do that. And if they wanted to come to her and say, for 21 years you've been doing one job, we'd now like you to do a different job. And that job now is highly religious and highly ministerial. They could have done that. But that's not what they did. They gave her a document, and then at no time did they tell her that her job was different. At no time did they offer her additional training. At no time did they attempt to tell her she wasn't doing her job as well. And when they fired her, they did not fire her because she was not performing the duties on the ministerial description. They fired her because she married her same-sex partner. So this is not a case where she was— That also is agreed. That is agreed. I take it there's no disagreement about the fact that that's contrary to Roman Catholic doctrine. It is contrary to Roman Catholic doctrine, right. So I'm not seeing what the actual disputes are. Well, if she were a minister, they could fire her for that reason. But if she's not a minister under the ministerial exception, that is not a basis because that is discrimination, the basis of sex. It's not clear to me why you think we should even consider this ministerial rule, which is a constitutional one, rather than Section 702A of Title VII. Why should we start with the Constitution rather than starting with Section 702A? No circuit court has ever ruled that Section 702A— No. Look, I'm asking a concrete question. I wish you'd address the question I asked rather than the question you wish I had asked. The question I asked is, shouldn't we start with the statute? If the answer is yes, then you can tell me why you prevail under the statute. But telling me something about the statute doesn't answer the question about the correct order of decision, and that's the question I ask. We would have no objection if the court started with Section 702. All right, so if we start there, let me tell you what concerns me about this. If you just look at the language of Section 702A all by itself, it looks like it's saying that a religious school can insist that it hire only co-religionists. In this case, that it would hire only Roman Catholics. But then we come to the definition of religion in Section 2000EJ, which says that it includes all aspects of religious observance and practice, as well as belief. Well, religious observance and practice includes things like prayer or not marrying a same-sex partner. So doesn't the definition added to 702A mean that those things also are comprised by this exception? That's what worries me. I think you could read the statute that way. Well, and so why shouldn't we? Well, you can't stop just reading the statute that way. You have to read the entire statute, and you also have to look at the case law. No, we don't have to read the entire statute because this is an exception from the rest of the statute. It says this subchapter doesn't apply if this is true. So we need to figure out what the exception means. Sure. You started by saying other circuits have not done this. But I would rather focus on the language of the statute and see what you think it means. Yeah. Let me read the language inserting the definition that they propose, and I would like to suggest that it becomes a nonsensical sentence. It's an indiscernible sentence. This subchapter shall not apply to a religious corporation, association, educational institution, or society with respect to the employment of a particular all aspects of religious observance and practice as well as belief unless an employer demonstrates that he is unable to reasonably accommodate an employee's religious observance or practice without undue hardship on the conduct of the employer's business to perform work connected with the carrying on of such corporation, association, education institution, or society of its activities. That's the plain language inserting the definition that defendants propose. It's generally why one writes statutes with definitions separate. And it's a nonsensical sentence. That's true of most definitions. If you plug a definition in, you don't produce a complete sentence because that's not the goal. Well, if the goal is to merely look at the text of the statute and apply it. Could you perhaps actually tell me why you think we should not treat, say, willingness to pray with students as an aspect of religious practice? Oh, I think you can. I think you can. But the statute, even if you include unwillingness to pray, has never been read to allow discrimination. Now you're going to what other courts of appeals have said. I don't want to do that. I recognize that you have decisions that effectively read the definition out of the exception and say it's only an exception for a demand that co-religions be hired. And we have some that say, well, it's not an exception for sex discrimination. The problem with that is it says this subchapter doesn't apply if. And the rule against sex discrimination is in this subchapter. So we need to tackle the exception on its own terms. We are not arguing that Section 702 only applies to co-religions. That's not what we're arguing. We're arguing that Section 702 does allow a religious organization to discriminate based upon religious beliefs, which can include prayer, so long as those religious beliefs do not also require the religious organization to discriminate on the basis of race, sex, or national origin. That's the problem. I don't get that. The exception is an exception from this subchapter. And this subchapter is the source of the rule against sex discrimination. It seems when the exception applies, it authorizes sex discrimination. I mean, there's just no way around that. That's the nature of this language. I know you don't like that, but that's what it says. I don't think it says that. Again, it creates a nonsensical sentence. And because it does not expressly include discrimination based upon race, sex, or national origin, it is a very fair reading to say that the reading is the appropriate one that every other circuit has ever given. And that's our position. Mr. Gutman, a moment on ministerial exception and the state law tort claims. Would we be creating a circuit split if we rule that the ministerial exception does not bar Ms. Starkey's state law tort claims? I don't believe that you would, under the facts of this case, be creating a circuit court split. In this case, the archdiocese is not the employer. And based upon their response to the answer, the archdiocese denied that Ron Colley was under the direction of the archdiocese. And we're aware of no case, and defendants did not cite a case, where under any first amendment theory, the ministerial exception or otherwise, a religious organization was exempt from tort liability where that religious organization was not the employer of the plaintiff bringing the case. Indeed, the general rule is that religious organizations are not exempt from general tort liability. Your Honor quoted that rule in the Demkovich decision, and that has always been the ordinary rule. But the torts here are very employment related and would require us to get into the employment dispute. Isn't that exactly what the Supreme Court told us courts should not be doing with religious organizations? I don't think so. Of course, the Supreme Court was very clear that it was only deciding a case involving the federal statutes. But there have been many tort cases that go directly at a religious organization's authority to retain, supervise, and fire its employees. Many of the abuse cases involve torts where the claim is that the church improperly supervised its priest by redeploying them elsewhere or not taking them away from access to its victims. Those are cases that go directly towards employment claims, and yet those tort cases have been allowed to go forward, and the general rule applies. Your state law claims here, though, one of the elements of each is the existence of an enforceable contract, which is the employment contract here. Sure. And wouldn't that require us to start getting into what's permitted under that contract and into the relationship, again, that the Supreme Court has told us to stay away from? Well, we don't really know yet because the district court did not allow discovery on that issue, and courts have proven the general rule that for procedural entanglement, courts are very good at sorting through those procedural entanglement issues, and for substantive entanglement, it's handled on a case-by-case basis. And here we don't have discovery yet and even know what— But you really need discovery of just looking at the elements. Sure. Sure we do. I think you can tell just looking at the elements what you're going to have to get into and the evidence that we do have. Well, we don't have evidence. We have the contract and what the contract clearly states. Sure, but we don't have evidence about what the archdiocese's role was with respect to that contract. The archdiocese was not the employer, and the archdiocese is making the claim here that it needs the autonomy over the decisions about employing and supervising its ministers. But here it was not the employer, and it denies that it was—that Ron Colley is in the direction of the archdiocese. So we don't know what role it plays, and that's exactly why in tort cases, it's handled on a—the substantive intrusion is handled on a case-by-case basis. And we don't know yet enough to know whether this is the kind of case—I mean, defendants themselves acknowledge that they are not generally immune from tort liability. They say they're immune from some torts and not others, and they claim that this just happens to be one of the others. And our point is, at a minimum, on the procedural posture of those tort cases, which is its judgment on the pleadings, to rule in favor of defendants in that case—in that claim. Did you want to reserve the remainder of your time? You only have three minutes left. Yes, thank you very much. Thank you, counsel. Mr. Goodrich. Thank you, Your Honor. May it please the Court. Luke Goodrich on behalf of the Archdiocese of Indianapolis and Ron Colley High School. Subject to the Court's questions, I'd like to start with the ministerial exception, but would like to pivot to the Title VII religious exemption toward the end, because that offers a straightforward statutory basis for resolving the plaintiff's claims. On the ministerial exception, Judge Young carefully reviewed the entire factual record and, based solely on the undisputed facts, held that Starkey falls well within the ministerial exception. And that was correct, and that was a straightforward ruling, because there are really two independent paths for concluding that Starkey fell within the ministerial exception. One is her role in faith formation. The second is her role in leadership. Either one of those roles is independently sufficient to bring her within the ministerial exception. To put those two roles together makes it a straightforward case. If I can unpack that, first, the role in faith formation. Here, her contract and her job description expressly designated her as a minister, and then her job description tasked her with faith formation in multiple respects. There's no dispute that that job description is the authentic document. There's no other competing job description out there. And then, on top of that, there are written evaluation criteria that were used in practice, saying that guidance counselors couldn't advance in their pay or their job status unless they were encouraging prayer with students, encouraging students' spiritual life, and sharing their own spiritual experiences with students in counseling conversations. Those undisputed facts by themselves bring Starkey within the ministerial exception, but those facts are not by themselves. Second, you have this entirely additional basis, her role in leadership within Roncalli. Specifically, aside from the principal and the assistant principal, she held the only position that was both a department chair and on the administrative council. As a department chair, she's over the guidance department. She's hiring, supervising, mentoring, evaluating the other guidance counselors as they carry out their duties. She's also supervising the social worker who's dealing with students in deep crisis. And then, aside from being a department chair, she's also on the administrative council. This is the key leadership body within the school responsible for carrying out the day-to-day religious mission of the entire organization. And it's undisputed what the administrative council, the topics that they were addressing, they were addressing planning for all school liturgies, who could serve as Eucharistic ministers, how to respond to student and parent protests when the other co-director of guidance was let go. And so Starkey's participation in that leadership body also independently suffices to bring her within the ministerial exception. And again, you put those two together, makes this a straightforward case. Mr. Goodrich, one of the arguments offered by the appellant is that you can't just place the label minister on a contract and then make someone fall into the exemption. At some point, the individual's role doesn't go to faith formation or doesn't go to leadership. And there's a history in this case, it seems, of this email from the outside lawyer, followed by the addendum, followed by the contract. At what point does the document that's signed by the individual not speak to that minister label? I think it would have to be a fairly extreme case. And the reason I say that is because of the Supreme Court's decision in Our Lady and this court's decision in Sterlinski and Gruskod, where in Our Lady, where the court is looking at function, it says what matters is what the employee does. And talking about function vis-a-vis the other factors like the title, substance reflected in the title and use of the title. And the number one place the Supreme Court goes to figure out what the function was is the written employment documents, the job description, the employee handbook. And those matter, and the Supreme Court said that the employer's articulation of the role is important. And the reason for that is, number one, it's pre-litigation, highly probative evidence of what the employer expected the employee to do. It also reduces entanglement. Because one really troubling position, one troubling aspect of the plaintiff's position here is if you have someone designated minister in their contract, tasked with faith formation and job description, evaluated under religious criteria, and a leader within the school, and all they have to say to get to a jury is, I didn't really, I did a lot of academic stuff too, I didn't really view my role as religious, I didn't try to incorporate religion into my role, so I get to a jury. That is a recipe for completely gutting the ministerial exception and for deeply, deep church-state entanglement in just about any ministerial exception case. Because, I mean, it's hard to imagine how you even structure a jury trial in this case. To your point, though, there are also, you know, you don't have to rely just on Our Lady and what the court said and Strelinsky and Griska. I mean, the factual record here on was this job description what the employer expected, those 2016 emails, the Archdiocese was doing a comprehensive review of its compensation structure in light of the Fair Labor Standards Act, and somebody said, hey, we might need to move guidance counselors away from an annual contract with a salary and to hourly pay without a salary. And Starkey crafted a strongly worded record, letter, this is page 130 of the Supplemental Appendix, and she attached the pre-existing ministry description for teachers, this is page 131 of the Supplemental Appendix, and in her own handwriting put a checkmark by every duty that she maintains guidance counselors were doing at that time, put a checkmark by every faith formation duty, praise with students, check, communicates the Catholic faith, check, and said, we guidance counselors are doing the same ministry tasks as teachers, so we're entitled to the same ministerial exception. And then the principal chimed in a couple pages later in the record and said, yes, guidance counselors are carrying out all these same religious duties as teachers, they're entitled to the same ministerial exception as teachers. I don't think you have to rely on that 2016 email, I mean, if you're going to draft a law school exam to test this issue, it would almost make it too easy, because it's such an obvious case. I think the case law gets you there without that email correspondence, but it makes it an obvious case for applying the ministerial exception. I think the other... Should the ministerial exception ever be a jury question, or is it something that courts should decide as a matter of law at summary judgment? The whole purpose of it is to avoid adjudicating these church matters and to avoid the state getting involved in it. Exactly, Your Honor. I mean, 50 years, it's been around for 50 years, and there's not one case that we have found or that plaintiffs cited that sent the issue to a jury. I haven't seen it defined as a question of law, though, as opposed to a question of fact. I haven't seen any case saying it should never go to the jury. There's no case that says, quote, it shall never go to a jury. Gruscott, this court, did say it's a legal question. That's where the plaintiff offered an expert opinion. Right. And the court said, no, that's a legal question. The courts are the experts. And I think this court's decision in Demkovich talks about the risk of entanglement if you're going to allow courts, let alone juries, to second guess religious organizations on what counts as religious or who counts as a minister. I do think Gruscott offers another straightforward path on the ministerial exception. That was the Hebrew teacher at the Jewish day school. And if you compare that case with this one, the Hebrew teacher was not designated in her contract as a minister. There was no written job description tasking her with faith formation. There were no written evaluation criteria, much less criteria she helped develop, that required Hebrew teachers to do religious stuff. And she had no leadership role within the school whatsoever. This court still found her to be a minister, relying mainly on two facts, both of which are present here. One was the fact that the school expected her to incorporate faith through the Hebrew curriculum. And that here, too, that was expressly in her job description, me to communicate the Catholic faith through the guidance curriculum. The second factor was that she, the teacher in Gruscott, had significant religious teaching experience when she was hired. Likewise here, seven years as a New Testament teacher and a certified catechist, preparing students to provide the music for the mass. And the principal testified without contradiction. That was a significant aspect in why he decided to elevate her to the co-director role. So Gruscott makes this a straightforward case as well. This question of the ministerial exception in the state law claims. It gets teed up a long time ago in the Bell case from the Fourth Circuit. Hosanna Tabor talks about state law claims. How broad is that umbrella going to be? Is it whether or not the state law claim has an employment contract element to it? Where should that line be drawn, do you say? The line should be drawn and has been, we would say in Hosanna Tabor and Our Lady, on any claim that would interfere with the selection of who gets to hold that ministerial role at a minimum. Demkiewicz extends it beyond selection to supervision. But here there's no question that the tortious interference claim, the whole basis of the tortious interference claim, is that she lost her job and should have been maintained in that ministerial role. So there's no question that that falls within the ministerial exception. That's supported by the Bell case in the Fourth Circuit, but also the Fratello case in the Second Circuit, the Cannata case in the Fifth Circuit, and other tortious interference cases that we collect in footnote eight of our brief. But it's not just the case law. I mean, the logic of the ministerial exception, the idea that you can't sue Roncalli to get your job back, but you can sue the archbishop because he decided to promulgate on a diocesan-wide basis these contracts and designate these people as ministers and require them to uphold Catholic teaching. That's even more intrusive into a matter of church governance, telling the archbishop you can't run your schools that way. And so those claims are plainly barred in the ministerial exception. There were a number of questions earlier on Title VII, and Title VII does offer a straightforward statutory basis for resolving all of Plaintiff's federal claims. I agree with Judge Easterbrook that it would be the normal and natural course for the court to address the statute. But, of course, the Supreme Court hasn't done it. I mean, what do we make of the fact that Hosanna Tabor doesn't address the statute first? That wasn't presented as one of the questions presented in Hosanna Tabor. You could argue that it could have been in the lower courts. But the way the doctrine is developed, there was the early Ninth Circuit decision reads the Title VII religious exemption very narrowly, right? That was one of the earliest decisions. It says it only bars claims of religious discrimination. For better or for worse, litigants just haven't really pressed it that often, pivot mostly to the ministerial exception. Is that how you practice? Once the Ninth Circuit decides something, it's gospel and no one ever questions it after that? Only if I'm in the Ninth Circuit, Your Honor. I don't think even in the Ninth Circuit you would take that position. No, Your Honor. It seems very strange to attribute that to lawyers all over the country representing religious denominations. I wish lawyers representing religious denominations did a much better job of presenting all the claims that I always wish they did. But as a matter of fact, they don't. I think one thing that you would find very interesting here is the Americans with Disabilities Act. Okay, so plainest view of the religious exemption is it bars only claims of religious discrimination, right? The Americans with Disabilities Act, it only prohibits discrimination based on disability. So, you cannot sue for religious discrimination under the Americans with Disabilities Act. Yet, the ADA has a religious exemption using the exact same language as Title VII. I'll read it to you. This subchapter. It's in 42 U.S.C. 12113D. This subchapter shall not prohibit a religious organization from giving preference in employment to individuals of a particular religion. Exact same phrase as Title VII. If all that language can do is bar claims of religious discrimination, then that whole religious exemption is simply meaningless in the ADA because there are no claims of religious discrimination in the ADA. And you might wonder, oh, well, is there a definition of religion in the ADA? No, there's not. But the very next subsection of that religious exemption speaks to this issue. It says, quote, a religious organization may require that all applicants and employees conform to the religious tenets of such organization. That's exactly the effect of Title VII's religious exemption. If you read it in light of the definition of religion, it applies all aspects of religious observance and practice, including belief. Religious groups can say we want our employees to conform to our religious tenets. That's exactly what the archdiocese has done here. It's undisputed that the employment decision here was based on the employee's religious observance and practice. So the Title VII exemption applies. I think in structuring an opinion, it would be perfectly normal to start with that statutory exemption, and all the Title VII claims would be barred by that. That said, there are still the state tort claims. How do you respond to counsel's argument that if we look at that provision, discovery needs to be done? There's no dispute of fact. I mean, the allegation is that the wrong colleague dismissed her because of her same-sex union in violation of church teaching and in violation of her contract. There's no dispute that that is a violation of church teaching. There may be harder cases where there's a he said, she said about why was this person dismissed, or did they really violate church teaching or not? But this actually gives you a gift of perhaps the easiest case you could draw up for interpreting Title VII's religious exemption for the first time as a question of first impression, where both sides agree what motivated the employment decision was the employee's religious observance and practice. His argument is about the archdiocese role and that discovery would need to take place with respect to the archdiocese role as opposed to the school itself. I thought counsel raised that in the context of the tortious interference claims. I thought it was with respect to both. Okay, that wasn't how I took it, but I would say the allegation here was that Ron Colley is the employer subject to Title VII. Ron Colley took an employment action based on this employee's religious observance and practice, and that that's the basis for the decision. We haven't disputed that, and so there's no need for discovery. And it's actually a straight – that's why we didn't move for judgment on the pleadings on that issue. And it would have actually saved the parties a lot of time, you know, not having to go through discovery on the ministerial exception, which Demkovich noted can be entangling. But I just point out the Title VII claims are kicked by the Title VII religious exemption, but the tortious interference claims, those are state law claims. They're not subject to the Title VII religious exemption. They're not subject to RFRA, so there is a need to address those in light of the ministerial exception or church autonomy. And if you want an example of a court that in a case like this one has addressed both constitution and statute, I would point to EEOC versus Catholic University. That's a D.C. Circuit opinion. They held that the employee there was a minister, and her claims were barred by the ministerial exception, but then went on to address RFRA and said her claims are also barred by RFRA. Now, I don't say that opinion is perfect. They probably should have addressed RFRA first before the ministerial exception and done the statute first. I'd say you could get there by Title VII is a much straighter path than RFRA is in light of this court's decision in Listecki. But that kind of example of addressing statute, saying it's barred by statute, also addressing the Constitution. And the issue here is there are so many statutory and constitutional protections that converge in this case. The whole point of the First Amendment is to allow religious organizations to form communities around shared religious beliefs and practices. I must say I don't understand what the Religious Freedom Restoration Act could possibly have to do with a case like this because it applies only to action by a governmental actor. And governmental actors don't have religion. Right? It's just completely exclusive. If a group claims to be a religion or a religious school, then it's not a governmental actor. How can the Religious Freedom Restoration Act play any role? So I'll start with the text. RFRA says it applies to all federal law. We have held that it applies to all federal agency action under federal law, not to private action. And I think that's the normal understanding. That's the basis of my question. Two points, one precedential, one textual. I don't think that is the normal – RFRA is designed to implement the First Amendment, right? First Amendment only applies to state action. No, it does not design to implement the First Amendment. It was designed to call for an outcome contrary to the Smith decision, which does implement the First Amendment. Right? Granted, if you think Smith is rightly decided, and obviously you're bound by it for now. It's a big if. That's why the Supreme Court held that that statute doesn't apply to the states. If it were Section 5 legislation, it would apply to the states. It definitely applies to the government. Look, we have law in the Seventh Circuit under which the Religious Freedom Restoration Act can't have anything to do with a case like this. Back to my question. Are you asking us to overrule it, to do something about it? I just don't see why you are introducing it. You don't need to reach it. Title VII religious exemption resolves it. Ministerial exception resolves it. We think Listecki is wrongly decided. And we think Bostock, in the Supreme Court's decision in Bostock, it brought up RFRA in a Title VII case between non-federal plaintiffs. That was a suit between private parties, and the Supreme Court said RFRA is a super statute that may apply here. There's no reason to bring it up if it doesn't apply there. You know, you obviously don't need to reach it, but you might want to flag it as an issue for future consideration. We ask that you affirm the district court. Thank you. Thank you, Mr. Goodrich. Anything further, counsel? Yes, I would like to address the two main points the defendants made with respect to the ministerial exception. First, they claimed that Starkey's functions were religious. Again, she expressly and voluminously contradicted with her evidence that she performed religious functions as part of her job. And defendants have offered no direct evidence that those two pieces of paper accurately describe her job. They presented the declaration of the principle, and this is at Essays 78 through 79, and that is an incredibly carefully and lawyerly written description in the present tense so that his description of the functions of the guidance counselor only to the date that he signed it, which was December 20, 2020, and not to the period of time when Starkey actually held that job. His description under oath, under penalty of perjury, expressly excluded Starkey as an employee at Ron Colley. And so if her boss, who defined her job, is not willing to say under penalty of perjury that that document described what she did, then I would suggest this court should not do so either. The only other evidence was from Angela Mailey, who also signed hers in the present tense, which was December 22, 2020, and she described her own job. But again, it is an inference that because what Angela Mailey's job was was also Starkey's job, and on summary judgment, the court is not allowed to make that inference. So there is a genuine issue of material fact of whether that job description, in the words of the Supreme Court, actually explained what she does. And let me talk about leadership. Starkey was on the Administrative Council. That was a multidisciplinary body of nine individuals, and she is very clear that her role on that was not to be religious. Other people had religious functions. The campus minister had religious functions. But just because she served with the campus minister does not mean that the campus minister's job becomes her job, in the same way that the campus minister was not responsible for the academic counseling that she engaged in. And so this was a multidisciplinary group that operated like about any group that included people with different functions. She expressly explained that she did not perform religious functions as a member of the Administrative Council. Was part of the guidance that she was giving spiritual? No. She expressly stated that she did not give spiritual guidance. If a student was searching for spiritual guidance, she said, that's not my job, that's not my expertise, and she directed that person to the appropriate individual, Ron Colley, that did handle spiritual guidance, whether that was the campus minister or the chaplain or the social worker. But she said, that's not something I did. I didn't have the expertise, and it was not my responsibility. Thank you. Thank you, Your Honor. Thank you very much, counsel, for cases taken under advisement.